IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISON

| | | |
|---|---|---|
| AMANDA MORENO, D.O., | ) | LAW NO. 4:23-cv-00121-SHL-SBJ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DEFENDANTS MAHASKA HEALTH** |
| | ) | **PARTNERSHIP and KEVIN DERONDE'S** |
| MAHASKA HEALTH PARTNERSHIP | ) | **STATEMENT OF UNDSIPUTED FACTS** |
| and KEVIN DERONDE, | ) | **IN SUPPORT OF MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| Defendants. | ) | |
| | ) | |
| | ) | |

**COME NOW** Defendants Mahaska Health Partnership ("MHP") and Kevin DeRonde, pursuant to Federal Rule of Civil Procedure 56(c)(1) and for their Statement of Undisputed Facts in Support of Motion for Summary Judgment, state as follows:

1.    Plaintiff Amanda Moreno, D.O., was employed by MHP under a Professional Employment Agreement (the "Agreement") to provide professional medical services to patients during assigned shifts in the Emergency Department at MHP subject to the terms and conditions of the Agreement.  Plaintiff's Professional Employment Agreement (Dep. Exhibit B), Defs. App. pp. 001-011.

2.    The term of the Agreement in place at the time her employment ended at MHP commenced on August 13, 2018, and continued until December 31, 2019, with automatic and successive twelve (12) month renewals thereafter.   Plaintiff's Professional Employment Agreement (Dep. Exhibit B); Defs. App. pp. 006-007.

3.    The Agreement contains a termination provision which enabled either party to terminate the Agreement, without cause, upon ninety (90) days advance written notice to the other

party:

      10.6 <u>Without Cause.</u> Without cause, upon ninety (90) days' advance written notice

      to the other party

Employment Agreement (Dep. Exhibit B); Defs. App. p. 007.

    4.    On October 1, 2021, MHP provided written notice to Plaintiff of its decision not to renew the Agreement dated August 13, 2018, pursuant to Section 10.6 of the Agreement. Pursuant to the written notice, her contract would end December 31, 2021 (after the conclusion of a 90-day period), with expectation that she would continue to serve MHP patients through December 31, 2021.  Plaintiff's Notice of Termination (Dep. Exhibit D); Defs. App. pp. 012-013.

    5.    At the time of Plaintiff was given notice that her contract was not going to be renewed, the emergency department at MHP employed five (5) physicians: Dr. Deb DeJong (female), Dr. Kymberly Life (female), Dr. Amanda Moreno (female), Dr. David Cornelder (male), Dr. Suzy Roefer (female). Moreno Dep. pp.126:7-127:3; Defs. App. p. 022.

    6.    MHP's C.E.O., Kevin DeRonde, made the decision not to renew Plaintiff's employment contract. DeRonde Dep. P. 156:7-11; Defs. App. p. 156.

    7.    Mr. DeRonde, as C.E.O, exercised MHP's contractual right to not renew the contract of Plaintiff without cause. Plaintiff's Professional Employment Agreement (Dep. Exhibit B); Defs. App. p. 007.

    8.    While no basis or reason was required to terminate Plaintiff's contract without cause, Mr. DeRonde testified that he based his decision not to renew Plaintiff's contract on Plaintiff's personal performance and the needs of the emergency department. Plaintiff's Professional Employment Agreement (Dep. Exhibit B); DeRonde Dep. p. 133:10-134:4. Defs. App. pp. 007; 041-042.

9.    At the time Plaintiff was given notice that her contract was not going to be renewed, Dr. David Cornelder was the Emergency Department Medical Director. DeRonde Dep. p. 89:22-24; Defs. App. p. 038.

10.    Dr. David Cornelder's contract with MHP commenced on March 2, 2020. Dr. Cornelder's Professional Employment Agreement; Defs. App. p. 059.

11.    Dr. David Cornelder's contract was not subject to renewal until December 31, 2025. Dr. Cornelder's Professional Employment Agreement; Defs. App. p. 056.

12.    Kevin DeRonde became the C.E.O. of Mahaska Health Partnership in 2018. Moreno Dep. P. 72:20-22; Defs. App. p. 017.

13.    When Mr. DeRonde became C.E.O. in 2018 he continued Plaintiff's contract with MHP. Plaintiff's Professional Employment Agreement (Dep. Exhibit B); Moreno Dep. p. 72:25-73:4. Defs. App. pp. 001-011, 073.

14.    Shortly after Mr. DeRonde became C.E.O. of MHP, he raised Plaintiff's salary $80,000.00. Moreno Dep. p. 73:5-8; DeRonde Dep. p. 320:15-23; Defs. App. pp. 073, 047.

15.    MHP Emergency Room physicians received yearly bonuses based on their ability to achieve quality metrics tied to their performances. DeRonde Dep. p. 91:9-21; Plaintiff's Quality Metrics Incentive Bonus Summary 2019-2021; Defs. App. pp. 039, 069-071.

16.    These quality metrics included 1) having fewer than 2% of patients leave without being seen; 2) attaining patient satisfaction scores (measured by independent third-party Press Ganey) above 58%; and 3) completing 100% of their EMTALA documentation.  DeRonde Dep. p. 91:9-21; Plaintiff's Quality Metrics Incentive Bonus Summary 2019-2021; Defs. App. pp. 039, 069-071.

17.    For the calendar years 2019-2021, Plaintiff never attained the quality metric bonus

in all three categories. Plaintiff's Quality Metrics Incentive Bonus Summary 2019-2021; Defs. App. pp.   069-070.

18.    For calendar years 2019-2021, Plaintiff never achieved high enough patient satisfaction scores to achieve the quality metric bonus in that category. Plaintiff's Quality Metrics Incentive Bonus Summary 2019-2021; Defs. App. pp. 069-071.

19.    For the calendar year 2019, Plaintiff did not receive a quality metric bonus in _any_ category. Plaintiff's Quality Metrics Incentive Bonus Summary 2019; Defs. App. p. 069.

20.    For the calendar year 2020 Plaintiff only attained the quality metric bonus in a single category: patients who left without being seen.  Plaintiff's Quality Metrics Incentive Bonus Summary 2020; Defs. App. p. 070.

21.    In addition to low quality metric scores, Plaintiff had other and additional issues with her performance while employed as an emergency physician with MHP including but not limited to:

    a.    Plaintiff baked and decorated penis and testicle cookies and brought them into the MHP department. Moreno Dep. p. 302:20-304:2; Defs. App. p. 034.

    b.    Plaintiff spoke poorly of patients and had poor attitude towards patients. Cornelder Dep. pp. 38:10-23, 42:14-43:15, 93:17-94:11;  Breon Dep.  pp. 93:17-94:11; Defs. App. pp. 074-077, 052-053.

    c.    Plaintiff had issues with integrity with other physicians. Breon Dep. pp. 95:24-99:24; Defs. App. pp. 053-054.

    d.    Plaintiff used profanity in the emergency department. Moreno Dep. p. 286:24-287:10; Defs. App. p. 033.

    e.    Patient complaints.  Moreno Dep. Ex. R; Defs. App. p. 078-080.

    f.  Sending patients home from the emergency department that should have been admitted. DeRonde Dep. p. 122:7-11, Breon Dep. pp. 87:25-90:11; Defs. App. pp. 040, 051-052.

    g.  Spending time on the internet when patients were not being cared for. Breon Dep. pp. 109:20-111:2; Defs. App. 055-056.

22.   In 2009, Plaintiff entered into a statement of charges and settlement agreement with the Iowa Board of Medicine relating to misconduct in connection with her medical license. Moreno Dep. Ex. A; Defs. App. pp. 081-087.

23.   Such misconduct on the part of Plaintiff included:

    a.  Engaging in sexual misconduct in the practice of medicine;

    b.  Unethical and unprofessional conduct in the practice of medicine; and

    c.  The violation of appropriate professional boundaries.

Moreno Dep. p. 42:14-43:20; Defs. App. p. 016.

24.   The MHP Emergency Department was also losing millions of dollars a year in 2021. DeRonde Dep. p. 133:10-134:4; Defs. App. pp. 041-042.

25.   In 2021, of the 513 employees of MHP, 425 were female and 88 were male. Defendants Answer to Interrogatory No. 3; Defs. App. p. 091.

26.   In 2021, of the 55 physicians and advanced practice providers with MHP, 30 were female and 25 were male. Defendants Answer to Interrogatory No. 17; Defs. App. pp. 098-099.

27.   While Plaintiff's contract was not renewed on October 1, 2021, she was scheduled to work the 90-day notice-period until December 31, 2021. Plaintiff's Professional Employment Agreement (Dep. Exhibit B); Moreno Dep. p. 110:25-111:3; Defs. App. pp. 007, 020.

28.   On November 4, 2021 Plaintiff was walked out of the hospital and placed on a paid

suspension after MHP had received several complaints regarding her behavior in the emergency department. Moreno Dep. Exhibit S; Moreno Dep. p. 115:8-16; Defs. App. pp. 021, 102-103.

29.     The complaint included several concerning comments and behaviors that took place during her recent shifts, including that Plaintiff made the comment that her "give a shit" was gone. Moreno Dep. Exhibit S; Moreno Dep. p. 281:18-282:5; Defs. App. pp. 031-032, 102-103.

30.     An employee reported to a MHP that on October 24, 2021, Plaintiff had been asked about when she intended to see a patient in the ED that she had not been into see after he had been waiting for one hour and 46 minutes.  She responded that she would go in when she was ready, not before.  She also reportedly stated, "When they fired me, my give a shit was done." .  Moreno Dep. Exhibit S; Moreno Dep. p. 281:18-282:5; Defs. App. pp. 031-032, 102-103.

31.     MHP also received information that another employee had reported other concerns from Plaintiff's shift on November 1, 2021 which specifically included a concern that Plaintiff was unmotivated and had not been going in to see some patients that had been in the emergency department for over an hour or two. Patients checked out without being seen.  Moreno Dep. Exhibit S; Moreno Dep. p. 282:23-283:8; Defs. App. pp. 032, 102-103.

32.     MHP also received information that a MHP paramedic had informed Plaintiff that the parents of a 13-day old patient were going to leave unless they saw a doctor soon, to which Plaintiff responded, "Then they can fucking leave, I have 20 other things to do first." Moreno Dep. Exhibit S; Moreno Dep. p. 282:12-283:8; Defs. App. pp. 032, 102-103.

33.     After receiving these complaints, Plaintiff was placed on temporary suspension with pay pending further investigation by human resources. Moreno Depo. p. 278:19-24 Defs. App. p. 031.

34.     On November 11, 2021, Plaintiff was provided a written Performance Correction

Notice.  Moreno Dep. Exhibit S; Defs. App. pp. 102-103.

35.    Plaintiff was paid her full compensation from October 1, 2021 through December 31, 2021, including her dates of suspension. Moreno Dep. p. 150:11-14; Defs. App. p. 024.

36.    Plaintiff was deposed on May 16, 2024.  There, Plaintiff has testified that as part of this lawsuit she is claiming that she was discriminated against on the basis of her sex and her religion and claims that she was retaliated against on the basis of her sex. Moreno Dep. p. 80:14-81:3; Defs. App. p. 018.

37.    Plaintiff testified that the act of discrimination she is claiming in this lawsuit is the non-renewal of her contract. Moreno Dep. p. 188:5-12; Defs. App. p. 026.

38.    Plaintiff testified at her deposition she has no evidence that Kevin DeRonde had any idea that she is atheist:

> Q.  What evidence do you have that Mr. DeRonde had any knowledge that you were an atheist during the course of your employment at Mahaska Health Partnership?
>
> A.  None.

Moreno's Dep. p. 100: 9-13.

39.    Similarly, Plaintiff has no evidence that any former Defendant knew Plaintiff was an atheist:

> Q.  So you have no evidence that Dr. Breon knew that you were an atheist during the course of your time at Mahaska Health Partnership?
>
> A.  No.

Moreno Dep. p. 100:21-24; Defs. App. p. 019.

> Q.  What evidence do you have that David Langkamp had any knowledge that you identified yourself as an atheist?
>
> A.  None.

Q.  What evidence do you have that Greg Gordy had any –

A.  None.

Q.  -- knowledge that during your employment you were an atheist?

A.  None.

Q.  What knowledge do you have that Amber Coffey or Marsha Riordan had any knowledge whatsoever that you were an atheist –

A.  None.

Q.  -- during the course of your employment at Mahaska Health?

A.  None.

Moreno Dep. p. 99:9-25; Defs. App. p. 019.

40.    Plaintiff admitted in her deposition that she has no evidence to support her religious discrimination claims:

Q.    All right.  So just to summarize, the act of discrimination that you claim was taken against you in employment based on your religion was the non-renewal of your contract; correct?

A.    Yes.

Q.    And you've now told me that you have no personal knowledge or direct firsthand knowledge to support that allegation; correct?

A.    Correct.

Moreno Dep. pp. 176:10-18; Defs. App. p. 025.

41.    Similarly, Plaintiff admitted she never overheard any inappropriate comments at MHP regarding religion in over eight years of working there:

Q.    All right.  And to be clear, you never personally overheard any inappropriate workplace comments about religion; correct?

> A.    Correct.

Moreno Dep. pp. 176:23-177:1; Defs. App. p. 025.

42.    Plaintiff admitted in her deposition that she never complained about the actions for which she now seeks to hold the Defendants liable:

> Q.    It's true, Ms. Moreno, that from when you started employment at Mahaska Health Partnership in 2013 until when your contract was non-renewed in October of 2021 that you never made a complaint of discrimination within the hospital; correct?
>
> A.    Correct.
>
> Q.    And it's true from when you started your employment at Mahaska Health Partnership until your contract was non-renewed in 2021 that you never made a complaint that you were being treated different based on your religion or gender; correct?
>
> A.    Correct.

Moreno Dep. pp. 79:24-80:10; Defs. App. p. 018.

43.    Sarah Dickey, the former Human Resources Director at MHP and Plaintiff in *Dickey v. Mahaska Health Partnership et. al.* testified in her deposition that Kevin DeRonde had told her back in 2020 that Plaintiff was atheist. Dickey Dep. p. 52:4-10; Defs. App. p. 106.

44.    Sarah Dickey (represented also by Plaintiff's same counsel and also suing Mr. DeRonde) is the only individual involved in this lawsuit that testified under oath that Kevin DeRonde ever even mentioned Plaintiff was an atheist. Dickey Dep. p. 52:4-10; Defs. App. p. 106.

45.    However, when asked if Kevin DeRonde had discussed Plaintiff's status as an atheist at any point during the meetings and timeframes regarding the decision to not renew Plaintiff's contract, Sarah Dickey testified that he had not:

Q. When, in discussing the contract non-renewals, did Kevin DeRonde say to you that Amanda Moreno was atheist?

A. Discussing the contract renewals, I don't recall a specific conversation about that during the contract non-renewals.

Q. So my question is, during this time frame where Kevin DeRonde is, to use your testimony, deciding to non-renew contracts of three physicians in the ER, am I correct that he did not discuss Amanda Moreno being an atheist at that time?

A. I don't recall a conversation where that happened during that time.

Dickey Dep. p. 252:11-24; Defs. App. p. 108.

46. Sarah Dickey testified that she believed it was Mr. DeRonde's honest belief that a change needed to happen in the emergency department at MHP. Dickey Dep. p. 189:5-9; Defs. App.p. 107.

47. Plaintiff admitted in her deposition that none of the Defendants (current or now dismissed) in this case made gender-related comments to her or to anyone else in her presence:

Q. Okay. And with respect to the individually-named defendants in this case, was there ever a point in time where any of these individuals sent you something in writing, for instance, that you felt was inappropriate or discriminatory in any manner –

A. No.

Q. -- prior to when your contract was non-renewed?

A. No.

Q. Did you ever, during the course of time you worked for Mahaska Health Partnership, observe any postings or writings of any sort put up by any of the named defendants that you thought were discriminatory or inappropriate in any way based on someone's gender or sex prior to when your contract was terminated?

A. Based on gender or sex?

Q.    Correct.

A.    No.

Q.    Did any of the named defendants ever send you an email or provide you something in writing that conveyed a joke based on someone's sex or had a negative comment about someone's gender in it?

A.    No.

Q.    Had you ever observed any of the named defendants made any kind of inappropriate gender-based comment to anyone else in the workplace?

A.    Not that I have direct knowledge of.

Moreno Dep. pp. 128:16-129:18; Defs. App. p. 022.

48.    There is no evidence that any of the Defendants knew Plaintiff contacted the Iowa

Freedom of Information Council about obtaining MHP's board meeting minutes.  For example,

Plaintiff testified as follows in her deposition:

Q.    Okay.  Did you ever speak with anyone who you have named in this complaint about the fact you had contacted the Iowa Freedom of Information Council to obtain meeting minutes?

A.    No.

Q.    Did you ever speak with anyone named in the petition or complaint individually to tell them that you had reached out to an organization known as the Iowa Public Information Board?

A.    No.

Moreno Dep. p. 146:18-147:2; Defs. App. p. 023.

49. Plaintiff testified as follows about her written notice of disciplinary action:

Q.    It says, "The patient [who had been waiting for an hour and 46 minutes] was getting anxious, and you were asked again to go in.  It has been reported you made a comment to a staff member

to the effect of, 'When they fired me, my give a shit was done.'"
Do you recall that?

A.    I don't recall saying that, but I very well could have.

Moreno Dep. p. 281:18-25; Defs. App. p. 031.

    …

Q.    And if we go to the second paragraph, it says, "Then on
November 1, there was a 13-day old baby with congestion."  Do
you remember working a shift on November 1?

A.    No.

Q.    It says, "Parents were very concerned, and nursing staff were
concerned due to the age of the baby.  And it was reported you
were asked three different times by nursing staff to go in and see
the baby."  Do you remember anything about this encounter?

A.    No.

Moreno Dep. p. 282:6-19; Defs. App. p. 032.

…

Q.    It states that you told the nurse, "I'll go in when I'm done
doing 20 other things."  And I think you just testified that's
something you probably did say?

A.    I probably did say that, yeah.

Q.    And then it goes on to note that the parents then checked
out of the hospital with the baby without being seen.  Any
reason to dispute that?

A.    No.

Moreno Dep. p. 282:23 –283:5; Defs. App. p. 032.

…

Q.    And then it goes on to say a tooth patient also came in on
November 1 of 2021.  "She was in pain and had been in the
ED for almost an hour."  Do you see that there?

    A. Yes.

Moreno Dep. p. 283:8-13; Defs. App. p. 032.

…

    Q. Do you have any reason to disagree with this statement?

    A. No.

    Q. And then it goes on to state that, basically, the patient was going to leave and the nurse told you that and you said, "Okay. Bye." Any reason to dispute that?

    A. I have no recall of that.

Moreno Dep. p. 283:17-24; Defs. App. p. 032.

…

    Q. You're not in a position to deny that that happened, are you?

    A. No.

    Q. And you would agree that, in fact, that's something that you could see yourself saying, would you not?

    A. Possibly, in the right situation.

    Q. And then in the fourth paragraph, it says, "It's reported another patient in the ED was getting fluids due to an allergic reaction." Do you remember this patient at all?

    A. No.

Moreno Dep. p. 284:3-14; Defs. App. p. 032.

…

    Q. It says staff reported that when you were told the patient was ready to leave, you stated, "Well, he's going to have to effing wait." Any reason to dispute that you made that statement?

    A. I don't recall saying that.

Moreno Dep. p. 284:20-24; Defs. App. p. 032.

…

> Q.    Okay.  So it may have happened; it may not have?
>
> A.    Correct.

Moreno Dep. p. 285:4-6; Defs. App. p. 032.

50.    As for Plaintiff's claims that Defendants retaliated against her by interfering with prospective employers, Plaintiff cannot identify who she alleges made any comments or what the comments were:

> Q. I want to talk specifically about the individuals who you've sued for this, starting with Mr. DeRonde.  Would you agree that you have no knowledge, personal knowledge, direct evidence, nor personal knowledge of a statement that you're attributing to Kevin that was made to a prospective employer?
>
> A.    I'm not sure who made what statements.
>
> Q.    Okay.  And is the same true with respect to David Cornelder, that being you have no personal knowledge, direct knowledge, evidence to suggest David Cornelder ever spoke to –
>
> A.    That's going to be the same answer for all those people.
>
> Q. Ever spoke to a prospective employer; is that correct?
>
> A. Correct.
>
> Q. And you have no knowledge or evidence to identify any statement attributable to Dr. Tim Breon to a prospective employer, do you?
>
> A. Correct.
>
> Q. And you have no knowledge of any statement that you attribute or evidence to attribute a statement to David Langkamp to a prospective employer, do you?
>
> A. No.

Q. And the same is true with respect to Amber Coffey, Greg Gordy, and Marsha Riordan?

A. Yes.

Q. So you're unable to identify for us, as you sit here in this deposition, any specific statement you will attribute to any individual defendant that you claim was made to a prospective employer?

A. Unless we depose the people that heard those statements and they are willing to share who it was.

MS. CODR: Can you repeat my question?
(Requested portion of the record was read.)

THE WITNESS: Correct.

Moreno Dep. pp. 260:20-263:8; Defs. App. p. 027.

51.    Plaintiff admitted in her deposition that Northern Mahaska is a different entity than

Mahaska Health Partnership, the Defendant in this case:

Q.    And when he references Northern Mahaska, do you understand that Northern Mahaska is actually a care facility?

A.    Yes.

Q.    That's not Mahaska Health Partnership, is it?

A.    No, but it's very closely tied.

Q.    It's not Mahaska Health Partnership, is it?

A.    No, it's not.

Moreno Dep. p. 269:18-25; Defs. App. p. 029.

52.    In support of her position, Plaintiff supplied an email from Ms. Hendricks, the

hiring person at Madison County Hospital, to Plaintiff telling her:

I appreciate your interest in our position.  Unfortunately, we have decided to continue our search.  I want to give you some honest feedback.  When google

searching you don't have any positive comments and a few pretty negative ones, the exit from Mahaska County is concerning to us and it felt uncomfortable to hear you talking about fraud and abuse. Another concern that the providers had was your willingness to make comments about the Governor as it relates to behavioral health. While I understand fully your frustration, it is always dangerous to make such bold statements to an audience that you don't know. The staff felt concerned that you might not filter opinions when in front of patients? Again, I just wanted to be honest with you as you pursue other interviews. I sincerely wish you the best in your search and certainly respect your years of experience, but there was a consensus that this is probably not the best fit.

Moreno Dep. Exhibit Q; Defs. App. p. 110.

53.    Ms. Hendricks does not state that she or anyone else at Madison County Hospital

reached out to anyone at Mahaska Health Partnership as a reference for Plaintiff:

> Q.    Nowhere in this document does she say anyone that you have named as a defendant made any comment about you, does she?
>
> A.    She did not state that explicitly.
>
> Q.    None of their names appear in this exhibit, do they?
>
> A.    They do not.

Moreno Dep. p. 273:8-14; Defs. App. p. 030.

…

> Q.    And what we know did happen, by Ms. Hendricks' own email, is that she did some Google searching, and she found out you didn't have any positive comments and that, in fact, you had a few pretty negative ones; right?
>
> A.    Correct.
>
> Q.    And there's no entry or posting on Google of which you're aware by any of the individual defendants in this lawsuit, are there?
>
> A.    I have no idea.
>
> Q.    Well, you're not able to point to any, are you?
>
> A.    Not that I'm aware of.

Moreno Dep. p. 272:11-23; Defs. App. p. 030.

    54.    Four additional physicians were hired to work in the Emergency Department prior to notice being given to Plaintiff that her contract was not going to be renewed: Dr. Chris Martin (male), Dr. Chad Torstenson (male), Dr. Trin Le (female) and Dr. Joshua Kamerath (male). DeRonde Dep. p. 151:7-20; Defs. App. p. 043.

    55.    Dr. Deborah DeJong remained an ED physician with MHP and she is still employed as an ED physician at MHP today.  Hagist Dep. p. 106:13-22; Defs. App. p. 119.

    56.    Dr. Kymberly Life received a new contract with MHP as an occupational health physician and she is still employed as an occupational health physician at MHP today. DeRonde Dep. p. 281:5-12; Defs. App. p. 045.

    57.    Neither Dr. Kymberly Life nor Dr. Deb DeJong had any gap of employment with MHP in 2021 as a result of receiving notices of non-renewals of their contracts in the ED.   Hagist Dep. p. 106:13-22; DeRonde Dep. p. 281:5-12; Defs. App. pp. 045, 119.

_____

Stacie M. Codr, AT0001502
Abigail L. Wallace, AT0012801
FINLEY LAW FIRM, P.C.
699 Walnut Street, Suite 1700
Des Moines, IA 50309
Telephone:  (515) 288-0145
Fax:  (515) 288-2724
scodr@finleylaw.com
awallace@finleylaw.com
cc: fdavis@finleylaw.com
**ATTORNEYS FOR DEFENDANTS**
**MAHASKA HEALTH PARTNERSHIP; and**
**KEVIN DERONDE**

Original filed.

Copy to:

Roxanne Conlin
Devin Kelly
ROXANNE CONLIN & ASSOCIATES, P.C.
3721 SW 61st Street, Suite C
Des Moines, IA 50321-2418
Phone: (515) 283-1111
Fax: (515) 282-0477
roxanne@roxanneconlinlaw.com
dkelly@roxanneconlinlaw.com
cc: dpalmer@roxanneconlinlaw.com
**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF FILING AND SERVICE</u>

       I hereby certify that on January 31, 2025, the foregoing was electronically filed with the Clerk of Court using the CM/ECF electronic system, which will send notification of such filing to all attorneys and partis of record.

*/s/ Abigail Wallace*